# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LUZ MARIA AGUILAR HARO,

    Petitioner,

v.                                          Case No. 10-C-389

DAVID FLIPPIN WOLTZ,

    Respondent.

## DECISION AND ORDER

This case arises under the Convention on the Civil Aspects of International Child Abduction, October 25, 1980 T.I.A.S., No. 11670 ("The Convention"), a treaty implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§11601-11611 ("ICARA"). Petitioner Luz Maria Aguilar Haro ("Aguilar") seeks the return of her child Nikolas to Mexico, which she alleges is the country of his habitual residence. Both the United States and Mexico are signatories to the Convention. Aguilar contends that the child's father, David Flippin Woltz ("Woltz") wrongfully retained the child in violation of their agreement that the child would remain with the father in Appleton, Wisconsin for the 2008-2009 school year. Woltz, on the other hand, claims that they simply agreed that Nikolas would come to live with him because his mother could not control him. He denies there was any time limit to the arrangement.

Although the question is close, I conclude that Woltz's retention of Nikolas at the end of the 2008-09 school year was not wrongful within the meaning of the Convention because by that time, Appleton had become Nikolas's habitual residence. Alternatively, even if the retention of Nikolas

at that time was wrongful within the meaning of the Convention, I would nevertheless decline to order his return because Nikolas objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his views. Accordingly, the petition will be denied.

## BACKGROUND

Aguilar and Woltz are the parents of Nikolas, who was born in Veracruz, Mexico on June 27, 1996. Woltz, an American citizen working in Mexico, had a relationship with Aguilar, who is an attorney and a citizen of Mexico, in 1995. While Aguilar was pregnant, but prior to Nikolas's birth, Woltz returned to the United States. Aguilar also has a daughter, Paulina, from a prior relationship. Paulina is approximately eight years older than Nikolas. Nikolas lived in Mexico with his mother and older sister until 2008.

After he was advised of the birth of his son, Woltz, who was then living in Miami, financially contributed to his support and visited him in Mexico periodically until Nikolas was eighteen months old. At that time, Aguilar began a relationship with one Guillermo Daniel Sanchez, whom she later married, and cut off contact with Woltz and his family. The marriage was short-lived, however, and after a divorce in 2004, Aguilar allowed contact to resume between Nikolas and Woltz. At that point, Woltz began visiting Nikolas in Mexico regularly and flying him, sometimes with his sister, to visit him and his parents in the United States. During this time Woltz made support payments to Aguilar of $800 per month and provided other financial assistance as well.

Beginning in 2006, Nikolas's behavior began deteriorating. According to a May 2006 neuropsychological report by Martha Vergara, Nikolas had discipline problems at school resulting from his physical and verbal aggression toward classmates to the point where many of his classmates had rejected him. The report also noted that he was aggressive with his mother and sister, and had become a frequent cause of disruption within the home. Ms. Vergara noted difficulties in family relationships, especially over his mother's role as sole authority figure and his rivalry with his older sister. In emails to Woltz, Aguilar described violent outbursts and disrespect exhibited by Nikolas toward both herself and Paulina. She also described disciplinary reports he received at school for showing disrespect for classmates.

Aguilar eventually asked Woltz to check into military boarding schools in the U.S. that could teach him discipline. She was particularly interested in a school near Chicago because he would be able to visit Woltz, who was now married and living in Appleton, on weekends. When they were unable to agree on how the costs of military school would be split, Woltz offered to have Nikolas live with him and attend school in Appleton, and Aguilar agreed. The parties differ, however, over what the terms of the agreement were. Aguilar claims that she agreed that Nikolas would live with his father in Appleton during the 2008-09 school year in order to learn English, and that he would then return to his home in Mexico at the end of the school year. Woltz, on the other hand, claims that the agreement was simply that Nikolas would live with him because his mother could not control him and that there was no time limit set. In any event, Nikolas came to live with Woltz and his wife Meghan in Appleton in July 2008. He was enrolled in 6th grade in the Appleton School District, and after an initial period of adjustment, successfully completed the school year with no disciplinary problems. Indeed, the undisputed testimony is that Nikolas blossomed in his

3

new environment. He participated in football, baseball and basketball, and made many friends both at school and in his neighborhood. He also developed a positive relationship with Woltz's wife Meghan and, by the time of the hearing, with their nine-month-old daughter as well.

In April 2009, as the school year was coming to an end, Woltz and Nikolas both informed Aguilar that Nikolas wanted to remain in the United States with his father. On May 14, 2009, Aguilar submitted a formal request for the return of her child pursuant to the Convention with the Mexican Central Authority, which forwarded the request on to the U.S. Central Authority. Woltz then filed a paternity action in Outagamie County Circuit Court, seeking both a declaration of paternity and legal custody and placement of Nikolas. Although Woltz attempted to have Aguilar served with notice of the proceedings in Mexico, it was not accomplished in accordance with the international conventions governing service of foreign nationals abroad. Despite this fact, the Outagamie County family court commissioner proceeded to hear the case and awarded sole custody and primary placement to Woltz by order of June 2, 2009.

In the meantime, Aguilar and her daughter arrived in Appleton on June 4, 2009, intending to return with Nikolas to their home in Mexico. Woltz refused to allow Aguilar to leave with Nikolas or to visit with him outside of his presence. After three days, Aguilar returned to Mexico. In October 2009, Aguilar hired an attorney to arrange a Christmas visit with her son. The effort was unsuccessful, however, as Woltz would not allow Nikolas to travel to Mexico out of fear that he would not be allowed to return, and Aguilar declined an offer to visit him in this country. Aguilar also sought legal assistance to pursue her claim for the return of her son under the Convention. She initially applied for publicly appointed counsel but did not qualify. She then retained counsel and on May 6, 2010 filed her petition for the return of her child with this Court. At an initial hearing

on June 11, 2010, the parties jointly requested the hearing be adjourned until August 16, 2010, to allow them to attempt to resolve the matter by agreement. Their efforts failed and the hearing proceeded as scheduled.

**ANALYSIS**

The Hague Convention was adopted to protect children from the adverse effects of being wrongfully removed to or retained in a foreign country and to establish procedures for their return. Convention, preamble. The Convention is meant to provide for a child's prompt return once it has been established that the child has been wrongfully removed to or retained in a signatory country. Convention, art. 1. The removal or retention of a child is wrongful where it is in breach of rights of custody belonging to another person in which the child was habitually resident immediately before the removal or retention. Convention, art. 3. In order to prevail on a petition for return of the child, the petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 11603(e)(1)(A). Specifically, the petitioner must show that: (1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal and retention was a breach of the custody rights under the laws of that state; and (3) the petitioner was exercising those rights at the time of the removal or retention. Convention, art. 3; *DeSilva v. Pitts,* 481 F.3d 1279, 1281 (10th Cir. 2007).

In a case arising under the Hague Convention, the Court's initial focus is on whether the removal or retention is wrongful. Importantly, the merits of the underlying custody dispute are not at issue. Convention, art. 19. "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006). In this

way, the Convention is intended to deter parents from wrongfully removing or retaining a child in order to obtain a more favorable forum. *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996). The policy underlying the Convention also insures that custody determinations will be made where recent information about the quality of family life is available. *Koch*, 416 F. Supp.2d 645, 649 (E.D. Wis. 2006) (citing Linda Silberman, *Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U.C. Davis L.Rev. 1049, 1065-66 (2005)).

It is clear that prior to 2008 the habitual residence of Nikolas was in Mexico. That is where he was born and where he spent his entire life, but for brief vacations with his father in the United States. Mexico was also the home of his mother, who until 2008 exercised sole custody over him. The question presented here is whether his habitual residence had changed over the nine months he was living with his father and attending school in Appleton. I find that it did.

The Convention does not define the term "habitual residence." In *Koch*, the Seventh Circuit, following *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir.2001), explained that in determining habitual residence a court should look first to the shared intent of the parents. 450 F.3d at 715. But it is not solely the intention of the parents that controls. Ultimately, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child can lose its habitual attachment to a place even without a parent's consent." *Id.* at 717 (quoting *Mozes*, 239 F.3d at 1081). "The establishment of a habitual residence requires an actual change in geography, as well as the passage of an appreciable amount of time." *Id.* at 715. And "[w]hen the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long." *Mozes*, 239 F.3d at 1078; *see also Feder v. Evans-Feder*, 63 F.3d 217, 224 (3rd Cir. 1995) ("[W]e believe that a child's habitual residence is the place where he or she has been physically present for an

amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.").

Applying these principles to the facts of this case, I conclude that Nikolas's habitual residence changed to Appleton, Wisconsin, by the end of the 2008-09 school year. From the evidence, I find that there was no shared intent that Nikolas would remain with his father for only the school year. Contrary to her allegations in the petition, I find that Aguilar's motivation for sending Nikolas to live with his father was not simply so that he could learn English. The evidence clearly establishes that she was having serious difficulty controlling him and was seeking help. Initially, she intended to send him to a military school in Mexico or the United States. When she could not reach agreement with Woltz on payment for such a school, she accepted his offer to have Nikolas live with him and go to school in Appleton. Although there may have been an expectation he would come back to Mexico for the summer, there was no discussion as to how long Nikolas would remain with his father. As to Woltz' intention, it is clear that he and his wife had made a commitment to have his son live with them indefinitely.

Regardless of the initial intentions or expectations of the parents, however, I find that Nikolas had become so acclimated to his new home in Appleton by the end of the school year that it had become his habitual residence. He had successfully adjusted to his new neighborhood and school, and actively participated in several different sports. More importantly, he had developed a close relationship with his father and stepmother, and his behavioral difficulties had ceased. His

7

father's home had become home for him, and he had developed the settled purpose of completing his elementary and secondary education in Appleton with the new friends he had made.

Since Appleton was his habitual residence by the end of the school year, it follows that Woltz's retention of his son after that time was not wrongful within the meaning of the Convention. But even if it was, the result would be the same. Article 13 of the Convention provides that notwithstanding a finding of wrongful removal or retention, "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." I am satisfied that this exception applies here.

With the consent of the parties, I spoke with Nikolas in chambers off the record and came away convinced that Nikolas fully understands his circumstances and has chosen to remain in the United States. While he loves his mother and half-sister, he has reasonably concluded that his future will be brighter in this country. The behavior problems both in school and at home that surfaced in Mexico have been eliminated. He has found friends and activities in the United States that he greatly treasures, and hopes to continue his education here. In contrast to the security under which his family lived in Mexico City, he enjoys the freedom of living in a safe neighborhood where he is allowed to visit friends on his own without fear for his safety. He has also developed a close relationship with his step-mother, Meghan, and his new nine-month-old half-sister.

In assessing Nikolas's reasons for wishing to remain in this country, I note that he is now fourteen-years-old and has spent significant time in both the United States and Mexico. There was no evidence that his father or stepmother had attempted to unduly influence him. In fact, Nikolas confirmed Woltz's testimony that his father had told him the choice was his and that he had offered

8

to send him back to Mexico if he wanted to return. In contrast, Nikolas believed that if he returned to Mexico, his mother would prevent him from returning to the United States until he was an adult. It was also clear from the evidence that she and other relatives from Mexico had expressed at least disappointment, if not resentment, over Nikolas's desire to remain with his father in the United States. Neither Woltz nor his wife were trying to influence Nikolas by treating him to a lavish lifestyle. He had been given chores in his new household and was expected to work up to his potential at school. Given his age and level of maturity and in the absence of any evidence of undue influence, I conclude that his desire should be taken into account and, under the circumstances, made decisive.

In sum, I find that at the time of the father's refusal to return him to Mexico, Nikolas's habitual residence had shifted to the United States. Accordingly, the retention was not wrongful within the meaning of the Convention. Alternatively, even if the retention could be considered wrongful, I would decline to order the return of the child because he objects to being returned and has attained an age and maturity at which it is appropriate to give strong consideration to his views. The petition is therefore denied, and this action is dismissed.

**SO ORDERED** this ___19th___ day of August, 2010.

      s/ William C. Griesbach
      William C. Griesbach
      United States District Judge